**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn**

Civil Action No. 19-cv-03367-REB-NYW

JACKSON BELCHER,

      Plaintiff,

v.

CHAD KELLY,

      Defendant.

---

**ORDER GRANTING IN PART MOTION TO STRIKE DEFENDANT'S EXPERT
JACQUELINE BLOINK PURSUANT TO FED. R. EVID. 702 AND 403**

---

**Blackburn, J.**

The matter before me is **Plaintiff's Motion To Strike Defendant's Expert
Jacqueline Bloink Pursuant to Fed. R. Evid. 702 and 403** [#36],[1] filed September 30,
2020. I grant the motion in part and deny it part as set forth herein.

## I. JURISDICTION

I have jurisdiction over this case under 28 U.S.C. § 1332 (diversity of citizenship).

## II. STANDARD OF REVIEW

The instant motion implicates Rule 702 of the Federal Rules of Evidence, which
governs the admissibility of expert witness testimony. The rule provides, relevantly, that

> A witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of
> an opinion or otherwise if:  (a) the expert's scientific,
> technical, or other specialized knowledge will help the trier of

---

[1] "[#36]" is an example of the convention I use to identify the docket number assigned to a
specific paper by the court's electronic case filing and management system (CM/ECF).  I use this
convention throughout this order.

> fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.  As interpreted by the Supreme Court, Rule 702 requires an expert's testimony be both reliable, in that the witness is qualified to testify regarding the subject, and relevant, in that the testimony will assist the trier in determining a fact in issue. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589-92, 113 S.Ct. 2786, 2795-96, 125 L.Ed.2d 469 (1993); *Truck Insurance Exchange v. MagneTek, Inc.,* 360 F.3d 1206, 1210 (10th Cir. 2004).  The Supreme Court has described the court's role in weighing expert opinions against these standards as that of a "gatekeeper."  *See Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. 137, 147, 119 S.Ct. 1167, 1174, 142 L.Ed.2d 248 (1999).

An expert may be qualified by "knowledge, skill, experience, training, or education" to offer an opinion on an issue relevant to the case.  FED. R. EVID. 702(a). *See also 103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006).  An expert opinion is reliable when it is based on sufficient facts or data, employs a methodology generally deemed reliable in the expert's field, and properly applies such methods to the facts of the case.  *See* FED. R. EVID. 702(b), (c), & (d); *United States v. Crabbe*, 556 F.Supp.2d 1217, 1222-23 (D. Colo. 2008).

Guided by these principles, the trial court has broad discretion in determining whether expert testimony is sufficiently reliable and relevant to be admissible.  *Truck Insurance Exchange*, 360 F.3d at 1210; *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235,

1243 (10th Cir. 2000).  The overarching purpose of the court's inquiry is "to make certain that the expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  ***Goebel v. Denver and Rio Grand Western Railroad Co.***, 346 F.3d 987, 992 (10th Cir. 2003) (quoting ***Kumho Tire***, 119 S.Ct. at 1176).  Generally, "rejection of expert testimony is the exception rather than the rule." ***United States v. Nacchio***, 519 F.3d 1140, 1154 (10th Cir. 2008), ***vacated in part on rehearing en banc***, 555 F.3d 1234 (10th Cir. 2009).  ***See also*** FED. R. EVID. 702 (2000 Advisory Comm. Notes).  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  ***Daubert***, 113 S.Ct. at 2798.

## III.  ANALYSIS

The underlying facts of this lawsuit are well-known to the parties and need not be repeated here.  Following the alleged altercation with defendant, Chad Kelly, which forms the basis of the claims herein, plaintiff, Jackson Belcher, returned home to Los Angeles, California, where he sought medical care.  Mr. Belcher ultimately underwent surgery to repair a nasal septal fracture.  Among other damages, Mr. Belcher seeks to recover from Mr. Kelly the $296,032.18 in medical expenses he incurred in connection with the treatment of his injuries.

To recover these medical expenses, Mr. Belcher will be required to show, *inter alia*, that they were reasonable.  ***Dedmon v. Continental Airlines, Inc.***, 2016 WL 471199 at *4 (D. Colo. Feb. 8, 2016).  "While the correct measure of compensable

damages for medical expenses is the necessary and reasonable value of the services rendered, rather than the amount actually paid for such services, the amount paid is 'some evidence of their reasonable value.'" *Lawson v. Safeway, Inc.*, 878 P.2d 127, 131 (Colo. App. 1994) (quoting *Palmer Park Gardens, Inc. v. Potter*, 425 P.2d 268, 272  (Colo. 1967)).

In an effort to challenge the reasonableness of Mr. Belcher's medical expenses, Mr. Kelly has engaged Jacqueline Bloink, a Certified Fraud Examiner, to compare the amounts billed to Mr. Belcher for his medical care to the amounts other healthcare providers in the same geographical area purportedly bill for similar services.  To do so, Ms. Bloink relied on a data repository called the Fair Health Data Base,

> an entity born out of an investigation by the attorney general of New York concerning potential conflicts of interest with a health care charge database owned by an insurance company affiliate.  In response to that concern, Fair Health was established as an independent, nonprofit entity responsible for collecting medical billing data from around the country.  That data is then compiled into a database and sorted by zip code.  Insurance companies, and to some extent, the public, can then access the database in an effort to determine what constitutes a reasonable charge for a particular treatment in a given area.

*Patriot All Pro Physical Therapy Centers, Inc. v. Vermont Mutual Insurance Group*, 2017 WL 7131757 at *2 (Mass. App. Dec. 18, 2017).  *See also* Fair Health, *Mission and Origins* (available at:  https://www.fairhealth.org/mission-origin) (last accessed: January 5, 2021).  As described on Fair Health's website, its database consists of

> [b]illions of billed medical and dental procedures contributed by private insurers and administrators who insure or process claims for plans covering more than 150 million individuals; and Medicare Parts A, B and D claims data, received from

> the Centers for Medicare & Medicaid Services through our
> Qualified Entity certification, reflecting claims for all
> individuals across the country enrolled in traditional Medicare
> from 2013 to the present.

Fair Health, *About Us* (available at:  https://www.fairhealth.org/about-us-full) (last

accessed: January 5, 2021).

Fair Health classifies the data it collects into so-called "benchmarks" representing

different medical services performed in various types of medical facilities.  The data is

then further refined into percentiles.  Ms. Bloink relies on the 75th percentile, which she

represents is the standard healthcare providers use when setting fee schedules for out-

of-network services.  Multiplying this figure by a geographic conversion factor, Ms.

Bloink opines that the Usual, Customary and Reasonable (UCR) value of the medical

services rendered to Mr. Belcher is far less than what his doctors in fact charged him.

Mr. Belcher objects that this testimony violates Colorado's collateral source rule.[2]

The collateral source rule provides that "[t]he fact or amount of any collateral source

payment or benefits shall not be admitted as evidence in any action against an alleged

third-party tortfeasor[.]"[3]  § 10-1-135(10)(a), C.R.S.  "A collateral source is a person or

company, wholly independent of an alleged tortfeasor, that compensates an injured

party for that person's injuries." ***Smith v. Jeppsen***, 277 P.3d 224, 228 (Colo. 2012).

---

[2]  The collateral source rule is considered a substantive rule of evidence and therefore is properly applied in a federal diversity case.  ***See Sims v. Great American Life Insurance Co.***, 469 F.3d 870, 880 (10th Cir. 2006); ***Blanke v. Alexander***, 152 F.3d 1224, 1231 (10th Cir. 1998).

[3]  A separate derivation of the rule, which provides for setoff post-verdict, is not at issue here.  ***See*** §13-21-111.6, C.R.S.  ***See also Phathong v. Tesco Corp. (US)***, 2012 WL 1205523 at *2 (D. Colo. April 11, 2012) (noting this statute, "although requiring courts to reduce jury verdicts based on certain collateral sources of revenue, does not alter the common law rule that such evidence should not be heard by juries and is therefore inadmissible at trial").

The statute codified "the common-law rule that evidence of payments from a source collateral to the tortfeasor has the potential to 'lead the fact-finder to improperly reduce the plaintiff's damages award on the grounds that the plaintiff already recovered his loss from the collateral source.'" *Boardman v. Hauck*, 2012 WL 3545681 at \*2 (D. Colo. Aug. 16, 2012) (quoting *Sunahara v. State Farm Mutual Automobile Insurance Co.*, 280 P.3d 649, 654 (Colo. 2012)).  Such evidence therefore is inadmissible at trial.

There is, of course, some tension between the dictates of the collateral source rule and a plaintiff's obligation to prove the reasonable value of medical services he received.  Recognizing as much, the Colorado Supreme Court concluded that the demands of the collateral source rule are paramount:

> [W]e hold that the pre-verdict evidentiary component of the collateral source rule prevails in collateral source cases to bar the admission of the amounts paid for medical services. Admitting amounts paid evidence for any purpose, including the purpose of determining reasonable value, in a collateral source case carries with it an unjustifiable risk that the jury will infer the existence of a collateral source – most commonly an insurer – from the evidence, and thereby improperly diminish the plaintiff's damages award.

*Wal-Mart Stores, Inc. v. Crossgrove*, 276 P.3d 562, 566-67 (Colo. 2012).  Thus, the question here becomes whether the Fair Health data on which Ms. Bloink's opinion as to the reasonable value of medical services rendered to Mr. Belcher relies runs afoul of the collateral source rule.

Other courts confronted with question of the admissibility of Fair Health data have concluded its admission would violate the collateral source rule because it is used

6

by insurance companies to set reimbursement rates. ***See, e.g.***, ***Verci v. High***, – N.E.3d –, 2019 WL 7707887 at *6 (Ill. App. Dec. 18, 2019), ***appeal denied***, 147 N.E.3d 680 (Ill. 2020); ***Besaw v. Dorman***, 2019 Fla. Cir. LEXIS 3397 at *6 (Fla. Cir. Ct. Aug. 9, 2019). Ms. Bloink, however, states that the data is based on billed, not reimbursed, amounts and also is used by healthcare providers themselves to set fee schedules.

This suggestion is fine, as far as it goes. Nevertheless, it elides the issue that Fair Health's data represents only the limited universe of what healthcare providers have billed to insurance companies.[4] It is an open secret that healthcare services frequently are billed differently based on whether a patient is insured.[5] Thus, any fee

---

[4] Moreover, even the rates billed to insured patients do not represent a true picture of what a provider is actually paid:

> With the increasing role played by public and private health insurers in the American health care delivery system, doctors, hospitals, and other medical care providers have developed charge structures that may have little or no relationship to the reasonable value of the medical services at issue, because the providers ultimately negotiate discounts from the listed charges and are reimbursed on the basis of the discounted rates.

***Law v. Griffith***, 930 N.E.2d 126, 133 (Mass. 2010). ***See also*** James McGrath, *Overcharging the Uninsured in Hospitals: Shifting a Greater Share of Uncompensated Medical Care Costs to the Federal Government*, 26 QUINNIPIAC L. REV. 173, 184-185 (2007) ("[T]he nation's health care payment systems . . . ha[ve] evolved into a system where a hospital's list price is relatively meaningless.").

[5] The amounts providers charge insured patients often bears no relationship to what they bill uninsured patients, who frequently are charged a premium. ***See*** George A. Nation III, *Healthcare and the Balance-Billing Problem: The Solution Is the Common Law of Contracts and Strengthening the Free Market for Healthcare*, 61 VILL. L. REV. 153, 153-54 (2016); Tamara R. Coley, *Extreme Pricing of Hospital Care for the Uninsured: New Jersey's Response and the Likely Results*, 34 SETON HALL LEGIS. J. 275, 307 (2010); Mark A. Hall & Carl E. Schneider, *Patients as Consumers: Courts, Contracts, and the New Medical Marketplace*, 106 MICH. L. REV. 643, 661-63 (2008). On average, uninsured patients are charged more than double what providers bill their insured patients. Johanna Catherine Maclean, et al., *Health Insurance Expansions and Providers' Behaviors: Evidence from Substance-Use-Disorder Treatment Providers*, 61 J.L. & ECON. 279, 286 (2018).

The degree of price markups varies by speciality as well:

> For basic office or hospital visits, primary-care physicians typically charge one-third to one-half more than they receive from insurers (i.e., insurers get discounts of 25%-33%). Markups are substantially higher for

schedule derived from Fair Health's data represents a healthcare provider's estimate of what an insurance company is likely to reimburse, which is not necessarily coextensive with the reasonable value of those services.[6]  Viewed in that light, the introduction of this evidence would indeed appear to violate the collateral source rule.

Even if it did not, however, opinions based such evidence would be irrelevant to the question whether the charges Mr. Belcher incurred were reasonable.  One aspect of relevance requires an expert's purported testimony to "fit" the facts of the case, that is, the opinion must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."  *Daubert*, 113 S. Ct. at 2796 (citation and internal quotation marks omitted).  *See also* FED. R. CIV. P. 702(a) (expert testimony must "help the trier of fact to understand the evidence or to determine a fact in issue").  The question the jury here must answer is not what it might be reasonable to bill some hypothetical (insured)

---

> high-tech tests and specialists' invasive procedures. Across a range of specialty services . . . physicians charge roughly two to two-and-a-half times what insurers pay.  In contrast, before aggressive managed care discounts, physicians' markups over Medicare and private insurance were roughly 25%-50% for both primary care and specialty procedures.
>
> . . . .
>
> Insurers pay [for hospital-based services] about forty cents per dollar of listed charges.  Thus hospitals bill uninsured patients 250% more than insured patients.  This disparity has exploded over the past decade: since the early 1990s, list prices have increased almost three times more than costs, and markups over costs have more than doubled, from 74% to 164%.

Hall & Schneider, *Patients as Consumers*, 106 MICH. L. REV. at 662-63.

[6]  Ms. Bloink attempts to address this disparity by suggesting that "[a] healthcare providers's fee schedule helps to eliminate the issue of bias between billing for an insured patient versus and uninsured patient *if* the fee schedule and charge is the same for each patient that receives the same service by the same provider. (**Motion App.**, Exh. 1 at 6 (emphasis added).)  Seldom has the word "if" been forced to do so much work in a sentence.  At the risk of doing violence to the memory of Winston Churchill, this is a tautology wrapped in an assumption inside a counterfactual.

patient before he is seen by a physician, but rather whether the expenses Mr. Belcher actually incurred were reasonable and necessary in the circumstances which confronted his doctors at the time he sought their care.  Attempting to judge a provider's charges retroactively by suggesting they do not meet some general standard fails to account for any number of factors which might justify a different charge in a particular case, all of which implicate medical considerations which are not within the realm of Ms. Bloink's expertise.  Accordingly, her opinion regarding the reasonableness of Mr. Belcher's medical bills must be excluded.[7]

## IV.  ORDERS

THEREFORE, IT IS ORDERED that **Plaintiff's Motion To Strike Defendant's Expert Jacqueline Bloink Pursuant to Fed. R. Evid. 702 and 403** [#36], filed September 30, 2020, is granted in part and denied in part, as follows:

1.  That the motion is granted to the extent it seeks to exclude Ms. Bloink's opinions, based on Fair Health data, as to the reasonable and necessary value of medical services rendered to Mr. Belcher; and

2.  That in all other respects, the motion is denied.

---

[7]  Ms. Bloink does appear qualified to opine as to any billing errors or irregularities in Mr. Belcher's medical bills, however.  Mr. Belcher's objections to her opinions on these matters go only to the weight, not the admissibility, of her testimony.

9

Dated January 6, 2021, at Denver, Colorado.

**BY THE COURT:**

Robert E. Blackburn
United States District Judge